IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| BRIAN THOMPSON and SHEILA THOMPSON, § § § *Plaintiffs*, § § v. § § RYAN CATE and the § CITY of TRINIDAD, TEXAS, § § § § *Defendants*. § | CIVIL ACTION NO. 6:24-cv-67 |

**PLAINTIFFS' ORIGINAL COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiffs Brian and Sheila Thompson file this Original Complaint against Ryan Cate and the City of Trinidad, Texas and would respectfully show the Court the following:

### I.   INTRODUCTION

1. Ryan Cate has made a career out of bouncing from one small law enforcement department to another, and has more than once demonstrated a lack of concern for constitutional boundaries. His conviction that he himself is above the law was on full display on April 7, 2022, when he used an alleged investigation of a stray dog as pretext to harass Brian Thompson. When told by Brian's mother, Sheila, that he could not be on their property without a warrant, Cate replied, "I can do whatever the f*** I want." Not long after, Cate tased Brian Thompson without warning or justification, then continued to tase him after he was unconscious. Adding insult to injury—perhaps to show he could indeed do "whatever the f***" he wanted—Cate arrested Sheila

without probable cause for allegedly interfering with public duties. That false charge was dismissed.

2. Brian Thompson now sues Cate for the use of excessive force under 42 U.S.C. § 1983, and Sheila Thompson sues him for false arrest. Both Plaintiffs additionally sue the City of Trinidad for hiring Cate as a police officer despite knowing he had a history of violating established constitutional rights.

## II. PARTIES

3. Plaintiff Brian Thompson is a resident of the State of Texas.

4. Plaintiff Sheila Thompson is a resident of the State of Texas.

5. Defendant Ryan Cate is a resident of the State of Texas. He may be served with process at his place of business, Oakwood City Hall, 135 Broad St., Oakwood, TX 75855.

6. Defendant the City of Trinidad is a political subdivision of the State of Texas and may be served with process through its chief executive, Mayor Larry D. Estes, 212 Park St., Trinidad, TX 75163.

## III. JURISDICTION AND VENUE

7. The Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 since Plaintiff is suing for relief under 42 U.S.C. § 1983.

8. Venue is proper in the Western District of Texas pursuant to 28 U.S.C. § 1391(b)(1) because Ryan Cate resides in the Western District of Texas, and all Defendants reside in Texas.

## IV. FACTUAL ALLEGATIONS

9. For reasons known only to him, Ryan Cate—then a police officer for the City of Trinidad—had a bone to pick with Brian Thompson. In the early evening of April 6, 2022, Cate

concocted a story—that Thompson was not properly containing his dog—as pretext to confront Thompson at his home.

10. Brian's mother, Plaintiff Sheila Thompson, saw a police vehicle drive by and then saw Cate approaching the house on foot. She went out to the front porch to meet him, and asked what she could help him with. Cate said he wanted to talk to Brian. Sheila asked if he had a warrant, because Cate had been harassing them about the dog (which was actually a stray, as the Thompsons had previously told Cate) and other petty, fabricated complaints. Cate said he did not need a warrant. Sheila told him he could not be on private property without a warrant, and Cate responded that she didn't know the law, and that he could do "whatever the f***" he wanted.

11. Cate said nothing about arresting Brian, or the existence of any warrants, but asked to speak to him about a loose dog allegedly present in the Thompsons' yard.

12. Knowing that the dog was a stray and that Brian had done nothing wrong, Sheila went to get him from his bedroom. Brian came to the door to speak with Cate. Cate asked about the dog, and Brian explained that it was not his dog, but a stray. Brian was visibly unarmed.

13. Cate, who was standing a couple feet away on the porch, repeatedly asked Brian to come outside. Brian asked several times if he was being detained or arrested, and Cate told him he was not. Since he was not being arrested, Brian stated that he would not come outside and that they could continue speaking in the doorway.

14. Brian suspected that Cate's real reason for coming to the house was to arrest him for the nonpayment of a misdemeanor fine from Gun Barrel City, for which Thompson had just recently received an extension from a judge on his deadline to pay the fine. Brian knew Cate was aware of the situation—and Cate knew that Brian had received the extension—because Cate had been nearby when the judge authorized it, and had been listening to the exchange.

15. Brian said he wanted to call the judge, and began dialing on his cell phone. As he did so, he stepped back slightly from the doorway, because cell phone service in that precise spot in the house was poor. However, the front door is a double doorway with glass panes, so Thompson was still fully visible to Cate.

16. Cate said, "You're under arrest," and immediately tased Brian. He did not give Brian any specific orders, nor did he give him any opportunity to comply or surrender.

17. At this time, Sheila was standing by the door, but was not blocking the doorway. Furthermore, Sheila was 66 years old at the time, 5 feet 2 inches tall and of just over 100 pounds. Cate—who is a large man probably well over twice Sheila's weight—rushed past her and tased Brian again. After the second shock, Brian fell to the floor unconscious. Cate continued to tase Brian with the taser in "drive stun" mode while he was unconscious. The amount of tasing was so extreme that it caused Brian to urinate and defecate on himself, and he had to be taken to the hospital before being transferred to jail.

18. Cate then proceeded to arrest Brian for the warrants out of Gun Barrel City and resisting arrest, and also arrested Sheila for interfering with public duties. Sheila's charge was later dismissed, as was Brian's charge of resisting arrest. She was in jail for approximately 29 hours before bonding out, and incurred significant costs in defending herself against the charge.

19. Interfering with public duties occurs (in relevant part) if a person "with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law."[1]

20. The Texas Penal Code states that "A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his

---

[1] TEX. PEN. CODE § 38.15(a)(1).

conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint."[2]

21. As described above, Sheila Thompson was standing near the door when Cate rushed into the house, but was not blocking the doorway. She took no affirmative actions to impede Cate. Moreover, practically speaking, Cate was not disrupted from performing his intended "duty," because he successfully entered the house and tased Brian into unconsciousness. No reasonable officer could have believed that Sheila had interfered with Cate's public duties, much less that anything she did ignored a risk "of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise."

### *Municipal Liability*

22. When the City of Trinidad hired Ryan Cate as a police officer, a reasonable inquiry into his background would have revealed that he recently had been in trouble for using unreasonable force, under strikingly similar circumstances as those alleged here.

23. In December 2019, Cate was working as a deputy for the Anderson County Sheriff's Department.

24. Around December 28, 2019, another Anderson County deputy entered a family's home without a warrant, ostensibly to investigate a child welfare call. Despite not seeing anything amiss, the deputy called for backup.

25. Cate arrived as backup. He entered the house acting aggressively, and according to the family, did not have any interest in investigating.

---

[2] TEX. PEN. CODE § 6.03(d).

26.   One resident, Devon Gordon, began filming the incident on his phone. Angered by this, Cate ordered him to stop filming. When Gordon refused, Cate forcibly wrestled the phone from his hand, put him in a headlock, and tackled him.

27.   Gordon was then arrested for interference with public duties, just like Sheila Thompson. Gordon's charges appear to have been dropped before they were even filed; a search of Anderson County criminal records show no records under his name. Anderson County conducted an investigation into this incident.

28.   A few months later, in April 2020, Cate left the Anderson County Sheriff's Department. Upon information and belief, this was a result of the incident with Gordon, described above. Cate went on to work for the Cedar Hill City Marshall's Office, where he stayed for only two months. He then returned to Anderson County for two months, before joining the Coffee City police department. Only two months after joining Coffee City, Cate was hired in Trinidad.

29.   In total, prior to being hired by the City of Trinidad, Cate had worked as a peace officer for ten different departments in ten years. Except for Anderson County and the Cedar Hill City Marshall's Office, these were all tiny police departments in cities with populations in the low four digits or less (Munday, Knox City, Garrett, Palmer, Wilmer, Pantego, Itasca, and Coffee City). Several of these positions only lasted a few months; Cate's employment with Knox City was for a mere 11 days, and he worked in Pantego for only six weeks. This kind of spotty service record suggests that Cate was repeatedly in trouble with his departments.

30.   Unsurprisingly, Cate left Trinidad after coming under fire for another situation in which he completely disregarded someone's rights. Around September 2022, Cate jumped over a woman's fence and trespassed on her property without a warrant. This was purportedly because he wanted to interview her as a witness; he had no warrant to come on to her property, and a sign

clearly stated "No Trespassing."  When challenged by the property owner, Cate gave her essentially the same message he gave Sheila Thompson: that he could do what he wanted and did not need a warrant.

31. Around the same time, the City's police chief sustained a complaint against Cate, finding him responsible for "Inappropriate Conduct and Rudeness," and stating that disciplinary action would be taken.  Upon information and belief, this was in response to the trespassing incident.

32. In fact, Cate had a reputation in the community for being a tyrant.  Just before he left the Trinidad Police Department, Cate was the subject of an online petition for his removal that garnered more than 250 signatures—nearly 30% of the entire population of Trinidad.

33. Almost immediately after leaving Trinidad, Cate was hired by the Oakwood Police Department—population 394.

34. In a somewhat bizarre twist, around 2017, Cate made an appearance on The Dr. Phil Show, a daytime talk show in which psychologist Dr. Phil Shaw speaks with guests about mental health issues.

35. On his appearance, Cate was told by Dr. Phil that he had an arousal disorder of his autonomic nervous system.  In other words, Cate's body reacts as if it is under threat—the "fight or flight" reaction—at inappropriate times.

36. It is very unfortunate that Cate suffers from this debilitating condition, but at the same time, such a condition is clearly contraindicative of a career in law enforcement.  It should come as no surprise that an officer who reacts as if he is in mortal danger, when he is not, would be prone to unreasonable aggression and unlawful uses of force.

37. Again, the City of Trinidad would have been aware of this fact, had it conducted a reasonable check of Cate's background. While a person's mental health is generally a private matter, Cate made his public by airing it on a nationally syndicated TV show.

### V. FIRST CAUSE OF ACTION: EXCESSIVE FORCE AGAINST BRIAN THOMPSON

38. All preceding paragraphs are incorporated here by reference.

39. The Fourth Amendment prohibits the use of an unreasonable amount of force in detaining a subject.

40. Generally, force may only be used where a subject is resisting arrest, attempts to flee, or presents an immediate threat to the safety of officers or others.

41. Here, Thompson was inside his own house. He was unarmed. Cate had not given Thompson any commands, and had expressly told him only moments earlier that he was not being arrested. When he suddenly told Thompson he was being arrested, he gave Thompson no opportunity whatsoever to comply. He also gave no additional commands, such as to get on the ground, or to turn around and put his hands behind his back.

42. Instead, he immediately tased him. Even after Thompson was lying unconscious on the ground, Cate continued to tase him.

43. This use of force was unreasonable because Thompson was not resisting arrest, attempting to flee, or presenting any threat of harm to anyone. This is even more obvious in the case of the continued use of the taser after Thompson was unconscious. Therefore, Thompson's Fourth Amendment rights were violated.

44. Thompson was severely injured by this use of force and had to be taken to the hospital.

## VI. SECOND CAUSE OF ACTION: FALSE ARREST OF SHEILA THOMPSON

45. All preceding paragraphs are incorporated here by reference.

46. As part of its protection against unreasonable seizure, the Fourth Amendment prohibits arresting a person without probable cause.

47. Probable cause exists where, based on all the facts he is aware of, an officer may reasonably believe a person has committed a crime.

48. Here, Sheila Thompson was arrested for interference with public duties.

49. Interfering with public duties occurs (in relevant part) if a person "with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law."[3]

50. The Texas Penal Code states that "A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint."[4]

51. As described above, Sheila Thompson was standing near the door when Cate rushed into the house, but was not blocking the doorway. She took no affirmative actions to impede Cate. Moreover, Cate was not disrupted from performing his intended "duty," because he successfully entered the house and tased Brian into unconsciousness. In fact, he was not even slowed down. No reasonable officer could have believed that Sheila had interfered with Cate's public duties, much less that anything she did ignored a risk "of such a nature and degree that the failure to

---

[3] TEX. PEN. CODE § 38.15(a)(1).
[4] TEX. PEN. CODE § 6.03(d).

perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise."

52. Therefore, Cate violated Sheila Thompson's rights when he arrested her without probable cause to believe she had committed any crimes.

### VII. THIRD CAUSE OF ACTION: MUNICIPAL LIABILITY

53. All preceding paragraphs are incorporated herein by reference.

54. A municipality may be liable where adequate scrutiny of an applicant's background would lead a reasonable supervisor to conclude that the plainly obvious consequences of the decision to hire would be the deprivation of a third party's constitutional rights.[5]

55. Here, as described above, an adequate inquiry into Ryan Cate's background would have led any reasonable supervisor to conclude that hiring him would lead to the precise constitutional violations alleged here—excessive force against a subject who presented no threat whatsoever, and false arrest on fabricated charges of "interference with public duties."

### VIII. DAMAGES

56. As a direct and proximate result of the above-described acts and omissions of Defendants, Plaintiffs have suffered serious damages. Accordingly, Plaintiffs seek to recover all actual, compensatory, and exemplary damages which have resulted from Defendants' above-described conduct. These damages include, but are not necessarily limited to, the following:

  a) Physical suffering;

  b) Mental pain and anguish, both past and future;

  c) Sheila Thompson's costs of criminal defense;

  d) Punitive damages against Defendant Cate; and

---

[5] *Parker v. Blackwell*, 23 F.4th 517, 522–23 (5th Cir. 2022).

e) Pre- and post-judgment interest in accordance with Texas law.

## IX.   JURY DEMAND

57. Plaintiff demands a trial by jury.

## X.   RELIEF REQUESTED

58. For the reasons stated above, Plaintiffs request that Defendants be summoned to appear and answer herein and that upon final trial or hearing, a judgment be entered in favor of the Plaintiffs and against the Defendants as follows:

a) Awarding Plaintiffs actual damages in an amount that is within the jurisdictional limits of this Court;

b) Awarding Plaintiffs punitive or exemplary damages in an amount that is within the jurisdictional limits of this Court;

c) Awarding Plaintiffs reasonable and necessary attorney's fees and costs of court;

d) Awarding Plaintiffs pre-judgment interest at the highest rate permitted by law;

e) Awarding Plaintiffs post-judgment interest at the highest rate permitted by law; and

f) Awarding Plaintiffs all such other and further relief, at law or in equity, to which he may show himself to be entitled.

Respectfully submitted,

/s/ *Roger Topham*
Roger Topham
State Bar #24100557
13809 Research Blvd. Suite 500
Austin, Texas 78750
(512) 987-7818
rt@tophamlaw.com

11